Nos. 23-2939 & 24-396

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA

PLAINTIFF-APPELLEE

*v.*

ATTILA COLAR

DEFENDANT-APPELLANT

On Appeal from the United States District Court
for the Northern District of California
No. 4:21-cr-00163-HSG-1
Honorable Haywood S. Gilliam, District Judge

APPELLANT'S REPLY BRIEF

DAVID L. ANNICCHIARICO
Law Office of David Annicchiarico
California State Bar Number 247544
584 Castro Street, Suite 654
San Francisco, California 94114
Telephone: (415) 948-5576
Email: WriteToDavidA@gmail.com
*Attorney for Appellant*
*Attila Colar*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................3

ARGUMENT ....................................................................................6

  I. A JUROR WITH ADMITTED BIAS AGAINST THE DEFENSE SERVED ON THE JURY, WHICH IS A SIXTH AMENDMENT ERROR REQUIRING AUTOMATIC REVERSAL FOR A NEW TRIAL. ...........................................................6

    A. Deference Does Not Permit Rubber-Stamping a Plainly Erroneous Ruling....................................................................8

    B. There Was No Waiver.........................................................9

    C. Juror Fox's Plainly Expressed Bias Wasn't Cured by His Unreliable, Mid-Trial Assertion That He Could Be Impartial. .....15

  II. THE CONVICTIONS FOR AGGRAVATED IDENTITY THEFT IN COUNTS 29-33 LACK SUFFICIENT EVIDENCE, IN VIOLATION OF DUE PROCESS, BECAUSE IDENTITY USE WASN'T AT THE CRUX OF THE OFFENSES...............................26

  III. COUNTS 47 AND 49 MUST BE REVERSED.......................................28

  IV.–V. COUNTS 47 AND 48 MUST BE REVERSED. ................................28

  VI. COUNT 36 VIOLATED THE SECOND AMENDMENT........................................29

  VII. THE GUIDELINES ENHANCEMENT FOR MISREPRESENTATION AS A CHARITABLE ORGANIZATION WAS AN ABUSE OF DISCRETION, REQUIRING REMAND FOR RESENTENCING. ...................................................29

  VIII. THE LOSS AMOUNT CANNOT INCLUDE INTENDED LOSS. ........................35

  IX. RESTITUTION ....................................................................43

CERTIFICATE REGARDING CIRCUIT RULE 32-1 ......................................43

# TABLE OF AUTHORITIES

## CASES

*Delgado v. United States*, 403 F.2d 208 (9th Cir. 1968) ......................................14

*Dubin v. United States*, 599 U.S. 110 (2023) ......................................................27

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997) ..24

*Irvin v. Dowd*, 366 U.S. 717 (1961) ........................................................................7

*Johnson v. Zerbst*, 304 U.S. 458 (1938)..................................................................9

*Kisor v. Wilkie*, 588 U.S. 558 (2019) ....................................................................35

*Miller-El v. Cockrell*, 537 U.S. 322 (2003)............................................................8

*Mollica v. United States*, No. 2:14-CR-329-KOB, 2019 WL 1296255

   (N.D. Ala. Mar. 21, 2019) .................................................................................34

*Musladin v. Lamarque*, 555 F.3d 830 (9th Cir. 2009)...........................................11

*Rehaif v. United States*, 588 U.S. 225 (2019)........................................................38

*Reynolds v. United States*, 98 U.S. 145 (1878) .......................................................8

*Skilling v. United States*, 561 U.S. 358 (2010) .......................................................8

*Strickland v. Washington*, 466 U.S. 668 (1984)....................................................12

*United States v. Aderinoye*, 33 F.4th 751 (5th Cir. 2022) ....................................34

*United States v. Alexander*, 48 F.3d 1477 (9th Cir. 1995)....................................25

*United States v. Banks*, 55 F.4th 246 (3d Cir. 2022)...............................................30

*United States v. Cruz-Gramajo*, 570 F.3d 1162 (9th Cir. 2009)..........................41

*United States v. Depue*, 912 F.3d 1227 (9th Cir. 2019) (en banc)........................9

*United States v. Diop*, No. 24-3774, 2025 WL 2602277

   (9th Cir. Sep. 9, 2025)........................................................................36

*United States v. Fumo*, 655 F.3d 288 (3d Cir. 2011) ...............................................35

*United States v. Gladden*, 78 F.4th 1232 (11th Cir. 2023)...................................27

*United States v. Gonzalez*, 214 F.3d 1109 (9th Cir. 2000) ............................15, 20

*United States v. Hackett*, 123 F.4th 1005 (9th Cir. 2024)....................................36

*United States v. Halliburton*, 870 F.2d 557 (9th Cir. 1989) ................................12

*United States v. Kirilyuk*, 29 F.4th 1128 (9th Cir. 2022)......................................34

*United States v. Lucas*, 101 F.4th 1158 (9th Cir. 2024)...........................30, 33, 40

*United States v. Martinez-Martinez*, 369 F.3d 1076 (9th Cir. 2004).........8, 23, 26

*United States v. McKinney*, 645 F. Supp. 3d 709 (E.D. Mich. 2022) ...........39, 40

*United States v. Mitchell*, 568 F.3d 1147 (9th Cir. 2009)....................................23

*United States v. Parviz*, 131 F.4th 966 (9th Cir. 2025) ........................................27

*United States v. Pinedo*, No. 21-50242, 2024 WL 2011970

   (9th Cir. May 7, 2024) ...................................................................17, 18, 19

*United States v. Wiley*, 103 F.4th 565 (9th Cir. 2024)..........................................13

*United States v. Yafa*, 136 F.4th 1194 (9th Cir. 2025)..........................................36

*Wright v. State of Tex.*, 533 F.2d 185 (5th Cir. 1976)..........................................13

**STATUTES**

26 U.S.C. § 501(c)(3) .........................................................................31, 32

**SENTENCING GUIDELINES**

§ 1B1.3.................................................................................................40, 41

§ 2B1.1.................................................................................................*passim*

§ 2K2.1.................................................................................................41

Nos. 23-2939 & 24-396

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### UNITED STATES OF AMERICA
PLAINTIFF-APPELLEE

*v.*

### ATTILA COLAR
DEFENDANT-APPELLANT

_____

### ARGUMENT[1]

I.   **A JUROR WITH ADMITTED BIAS AGAINST THE DEFENSE SERVED ON THE JURY, WHICH IS A SIXTH AMENDMENT ERROR REQUIRING AUTOMATIC REVERSAL FOR A NEW TRIAL.**

Pasha's opening brief explained that a juror with actual bias

participated in convicting him, in violation of his Sixth Amendment right

to "a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*,

_____

[1]   Pasha files this reply brief responding to the portions of the government's brief for which he believes further argument will assist the Court in resolving the issues presented.  He continues to rely on each of the claims in his opening brief and intends no waiver of any argument due to a lack of comment herein.

366 U.S. 717, 722 (1961). Far from indifferent, juror Fox clearly expressed that his memories of violent persecution were triggered by Pasha's defense, which angered him, and which he prejudged as illegitimate. Pasha's statements in voir dire caused Fox to relive his trauma as a gay, transgendered, and non-binary person, who had suffered housing discrimination and multiple assaults with a deadly weapon. He said Pasha's comments were "festering in [his] head" and would "stick in [his] head the entire time." 2-ER-87.[2] There couldn't be a stronger claim of bias. Appellant's Opening Brief (AOB)-29-45.

Yet the government maintains that this Court should defer to the district court's decision to seat the juror, that the colloquy with Fox mid-trial showed the bias had evaporated, and that Pasha waived the claim by not requesting additional colloquy with Fox when the prosecutor later suggested it. None of these contentions has merit. This grave violation of

_____

[2] Citations to "ER" refer to Pasha's excerpts of record filed in docket number 52. Citations to "PER" (Prior Excerpts of Record) refer to the excerpts, filed in docket number 16, by Pasha's prior appellate attorney who was relieved. Citations to "FER" refer to the Government's Further Excerpts of Record, filed in docket number 65.

the foundational principle of law "that a juror who has formed an opinion cannot be impartial," *Reynolds v. United States*, 98 U.S. 145, 155 (1878), demands reversal for a new trial with an unbiased jury.

## A. Deference Does Not Permit Rubber-Stamping a Plainly Erroneous Ruling.

In its answering brief, the government invites this Court to rubber-stamp the district court's ruling, with citations to cases stating that great deference is owed to the lower court's firsthand evaluation. Appellee's Brief (AB)-35-36. To be sure, a district court's decision whether to seat a juror is accorded particular deference. *Skilling v. United States*, 561 U.S. 358, 386, 396 (2010). However, "deference does not imply abandonment or abdication of judicial review." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). In *United States v. Martinez-Martinez*, 369 F.3d 1076, 1082 (9th Cir. 2004), this Court explained that a juror bias decision "should only be overturned for manifest error or abuse of discretion." But in the very next breath it cautioned, "At the same time, '[d]oubts regarding bias must be resolved against the juror.' [Citation.]" *Id*. Moreover, an abuse of discretion in admitting a juror who expressed bias occurs whenever a district court

8

"bases [its] decision 'on . . . a clearly erroneous finding of fact,'" which is precisely what occurred here. *United States v. Kechedzian*, 902 F.3d 1023, 1027 (9th Cir. 2018) (citation omitted). Deferring to this violation of Pasha's fundamental constitutional right would be gravely unjust.

**B.    There Was No Waiver.**

Initially, the government contends that Pasha waived his objection to the biased juror by not asking for additional colloquy after the juror had already been examined twice. The claim is meritless.

Waiver occurs where a defendant intentionally abandons a known right. *United States v. Depue*, 912 F.3d 1227, 1233 (9th Cir. 2019) (en banc). Courts are bound to "indulge every reasonable presumption against waiver of fundamental constitutional rights . . . ." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). The government fails to rebut this presumption. In fact, Pasha specifically stated he was persisting in his objection.

After alternate juror Fox initially demonstrated his bias against Pasha, and after he was later seated as a juror over Pasha's repeated objection, the district court expressly recognized there was "an ongoing

objection that's being maintained to Mr. Fox serving from the defendant, and that's preserved for the record." 2-ER-105. The Court then proceeded to seat Fox over Pasha's ongoing objection, finding that additional colloquy with the juror had ameliorated the bias. 2-ER-105-06. Pasha responded that he was "going to continue the objection" because, "although [Fox] said [he could be impartial]," there was too much risk that Fox would be triggered during trial, "so I don't think he can put it to the side." 2-ER-106. The court once again expressly stated that the objection was "preserved for the record on appeal." 2-ER-106.

Despite Pasha's repeated objections, and the court's assurance that the issue had been preserved for appeal, the government claims that Pasha nonetheless waived his constitutional right by not taking the prosecutor up on his suggestion later in the trial that they might examine the juror a third time. Toward the end of trial, the prosecutor volunteered that, while he thought the prior record was adequate to show a cessation of the juror's bias, perhaps the defendant would want to have further colloquy about whether any of the evidence had triggered the bias once again. 12-PER-

1861.  Pasha responded: "*I still will object*, your honor, to him being on the jury. [¶] But we can do that--."  12-PER-1862 (emphasis added).  Pasha thus explicitly and intentionally retained his objection, but was willing to go along with the suggestion.  The court replied, "I see where the Government is going with this, and I'll consider it."  *Id*.  After other matters were then discussed, Pasha stated he was "objecting to the juror coming out."  12-PER-1869.

Pasha's consistent, repeated objections were adequate to preserve his claim, as the district court explicitly assured.  Contrary to the government's assertions, nothing about Pasha declining the prosecution's invitation for a third inquiry of the juror could satisfy the government's burden of rebutting every reasonable presumption against the intentional waiver of a fundamental constitutional right.  Pasha could very reasonably have concluded that subjecting Fox to examination for a third time about his traumatic experiences put Pasha in jeopardy by risking making the juror feel persecuted and heightening the bias against him.  *Cf. Musladin v. Lamarque*, 555 F.3d 830, 846 (9th Cir. 2009) (counsel may reasonably decide

not to request a jury instruction to avoid reminding the jury of unfavorable evidence); *Strickland v. Washington*, 466 U.S. 668, 689 (1984) (courts "must indulge a strong presumption" that an attorney's decision was "'sound trial strategy'") (citation omitted).  Moreover, the government can't manufacture a waiver by continually inviting the defendant to take some action, particularly one that isn't certainly beneficial to him.

No case cited by the government requires the defendant to ask for repeated examinations of the juror in order to preserve a bias claim.  Each of the government's citations is distinguishable or inapposite.  In *United States v. Halliburton*, 870 F.2d 557, 558 (9th Cir. 1989), the defendant moved for a mistrial because some jurors had seen in him handcuffs.  All counsel rejected the district court's suggestion that the jurors be examined to assess any impact.  *Id*. at 558-59.  Rather than holding the claim waived, this Court addressed it on the merits, finding that the curative measures the district court ultimately took eliminated the risk of bias.  *Id*. at 561.  *Halliburton* noted that the Fifth Circuit had held that any error from a "'brief and fortuitous' display of a defendant in handcuffs" is waived if the defendant

doesn't examine the jurors about it, *Wright v. State of Tex.*, 533 F.2d 185, 187-88 (5th Cir. 1976), but this Court didn't have to decide that question. *Id*. Accordingly, *Halliburton* doesn't support the government's position. Crucially, the case is also inapposite because it didn't involve a situation like the present case where the juror *was* examined *twice*, and the defendant merely declined to have him examined a third time (which the court didn't even affirmatively offer here, but only said it would consider).

*United States v. Wiley*, 103 F.4th 565 (9th Cir. 2024) doesn't provide any more help to the government. There, the defendant's ankle monitor beeped in court. *Id*. at 577. The judge took curative action by ordering a recess and having it removed outside the presence of the jury. *Id*. The defendant neither objected nor asked to voir dire the jurors. *Id*. This Court held that he therefore lacked any evidence to establish prejudice. *Id*. Parenthetically, *Wiley* cited *Halliburton*, noting that a defendant's decision not to voir dire the jurors "may" result in a waiver. *Id*. But like in *Halliburton*, there was no holding in *Wiley* that the defendant had waived his claim, let alone a holding that he had to acquiesce in repeated

13

examinations of the juror after the juror had already been examined twice, and the defendant had lodged a continuing objection that the trial court said was preserved for appeal. *Wiley*'s holding was only that the defendant failed to establish prejudice from the beeping ankle monitor. *Id*.

Finally, the government cites *Delgado v. United States*, 403 F.2d 208, 209 (9th Cir. 1968) for the proposition that a defendant who declines the court's offer of a mistrial waives a claim of error. The court didn't offer Pasha a mistrial in this case, however – far from it. The court didn't even state it would permit questioning juror Fox further. A proper analogy to *Delgado* would be if the court had conceded that Fox should have been removed for bias, offered Pasha a mistrial, and Pasha refused. Of course, none of that occurred here.

As the district court recognized, Pasha preserved his claim for appeal by repeatedly objecting. The government has failed to rebut the presumption against waiver of the fundamental right to a trial by an impartial jury.

### C. Juror Fox's Plainly Expressed Bias Wasn't Cured by His Unreliable, Mid-Trial Assertion That He Could Be Impartial.

The government offers no plausible argument, nor could it, that Fox's pretrial statements didn't disqualify him from serving on the jury. *See United States v. Gonzalez*, 214 F.3d 1109, 1112 (9th Cir. 2000) (actual bias is "the existence of a state of mind that leads to an *inference* that the person will not act with *entire* impartiality") (emphasis added). There is no question but that the juror's comments about his severe trauma, triggered by what he saw as Pasha's illegitimate defense, demonstrated he was unsuitable to be an indifferent, impartial decisionmaker. Even if there had been an inkling that he might have been able to give the defendant a fair trial, the inviolability of the fundamental constitutional right to a jury trial requires that any "'[d]oubts regarding bias must be resolved against the juror.' [Citation.]" *Id*. at 1114. When considering moving Fox from an alternate to a seated juror, the district court plainly evinced its own doubt about Fox's suitability when it stated: "[W]e all know that we're going to have to voir dire Mr. Fox again given what he said, and we'll have to see where that goes. . . . So we could end up with a very thin bench." 2-ER-10.

15

Nonetheless, the government makes the pale claim that Fox's statements earlier in the voir dire show that, "[i]f anything, Fox was sympathetic to Colar's defense." AB-47. The government asserts that the juror remained positive toward the defense in the face of "inflammatory" and "aggressive" voir dire by Pasha. AB-44-45.

First, the government's characterization of Pasha's questions to the jurors as being inflammatory and aggressive is wholly unfounded. Pasha merely asked the prospective jurors to raise their hands regarding whether they believed law enforcement was honest and trustworthy or abused power, and whether the jurors were familiar with historical persecution of the Nation of Islam or other African-American organizations by law enforcement. 2-FER-308-10. These questions were appropriate and corresponded with Pasha's anticipated defense that the prosecution against him was improperly motivated, and that the charges against him were trumped up.

Moreover, Fox's responses didn't demonstrate that he was on Pasha's side. His comments were at best neutral. He said current discrimination

16

against African-Americans didn't compare in severity to the era of Martin

Luther King, nor the era when Black Wall Street was burned to the ground.

2-FER-310.  Fox believed that, today, some officers are good and some are

bad; "it is a very case-by-case basis."  2-FER-309, 310.

The present case is unlike the government's cited case *United*

*States   v. Pinedo*, No. 21-50242, 2024 WL 2011970 (9th Cir. May 7, 2024)

(unpublished).  There, this Court found that a juror's equivocation

appeared to be "the result of intense questioning rather than a genuine

departure from impartiality."  *Id*. at *2 (footnote omitted).  The context

was the COVID-19 pandemic, which resulted in the parties drafting a 69-

question form seeking to address prospective jurors' ability to be impartial

in a case of sexual enticement of a minor.  *Id*. at *1.  Any prospective juror

who needed further examination were called into the courtroom by

themselves and asked "about their written answers, as if being cross-

examined."  *Id*.

Several jurors, including Juror 30 to whom the "intense questioning"

passage above applied, showed nervousness when answering.  *Pinedo*, 2024

WL 2011970 at *1. She made equivocal statements, including that it would be difficult to not be biased by the charge involving a minor, that she probably wouldn't be a good juror for the case, and that she would try her best to be impartial. *Id*. at *2. But she had made three unequivocal statements in her questionnaire that she could be impartial. *Id*. The district court "'agree[d]' with the prosecutor that during voir dire 'there were a handful of leading questions both ways and [Juror 30] would respond accordingly, but . . . ultimately there is no reason to think her written questionnaire [sic] she stepped off of that position in any meaningful way.'" *Id.*

A majority of this Court held that this wasn't an abuse of discretion: "Juror 30 on voir dire faced tough questions from the prosecution, defense, and district court, as if being cross-examined. Among her answers were 'I don't know what to say,' and 'Why are you guys pressuring me[,] I don't know what to say.' The intensity of her questioning provides context for her relative equivocation during voir dire, like the statement that she '[p]robably . . . wouldn't be a good juror.'" *Pinedo*, 2024 WL 2011970 at *2.

*Pinedo* is easily distinguishable. First, juror Fox's comments – that Pasha's statements in voir dire "pisse[d] me off" and "upset[] me to no end," that there was "no substance" to the defense, which was merely "a scapegoat" for a crime committed, 2-ER-87, 89-90, that it triggered his trauma from being gay, transgendered, and non-binary person, who had suffered housing discrimination and multiple assaults with a deadly weapon, and that it would "fester" and "stick in [his] head the entire time," 2-ER-87 – exhibited far more bias than the *Pinedo* juror's worries that she might not be the best juror for the job. Second, Fox hadn't been subjected to any tough cross-examination, nor did he decry that he felt pressured by intense examination by the attorneys. Finally, *Pinedo* was a fractured, unpublished opinion and, respectfully, the forceful dissent had the much better view. *Pinedo*, 2024 WL 2011970 at *4-7 (Bennett, J., dissenting); *see also Kechedzian*, 902 F.3d at 1030 (equivocal responses about ability to be impartial fail to satisfy the Sixth Amendment).

The government is also incorrect that the mid-trial colloquy with Fox was adequate to dispel the serious risk that he wouldn't be entirely

19

impartial.  True, Fox said at that time that he could set his bias aside.  But the circumstances render those statements highly unreliable, particularly in the face of the severe bias against the defense that Fox had so fervently expressed.  Definitive statements that a juror can now be impartial "cannot be dispositive" and must bend to the "accused's rights" when the court is presented with "the reality of [a juror's] biased attitudes." *Gonzalez*, 214 F.3d at 1112 & n.3 (citations and quotation marks omitted).  Moreover, this Court has cautioned that jurors are "[f]requently . . . reluctant to admit actual bias, and the reality of their biased attitudes must be revealed by circumstantial evidence." *Id*. at 1112-13.

Indeed, the circumstances here are critical to a proper evaluation because they were such as to exert pressure on Fox to say he was up to the task.  As described in the opening brief, the judge began the second colloquy by telling Fox he had already been moved from an alternate to a deliberating juror and was "now part of the jury."  2-ER-101.  Fox would be letting down a federal judge by contradicting him and saying that he was still impacted by his bias and couldn't serve.  He may well have felt he

20

needed to assure the court he was ready for the duties he had been ordered to perform.  And that wasn't the only pressure he was under.  Pasha then cross-examined him, probed him about his bias, and told Fox directly that he didn't want him to be on the jury.  Jurors are of course human beings, with all of the ordinary social characteristics, including an inclination to want to smooth over a socially uncomfortable confrontation by assuring that he wouldn't cause any problems.

Fox also couldn't help but be influenced by the trial evidence that had come before, as well as the government's detailed opening statement of all the evidence it intended to submit to prove Pasha had committed *44 crimes*.  "[P]art of the reason voir dire is conducted before the presentation of evidence is to isolate a prospective juror's biases from what they hear at trial."  *Kechedzian*, 902 F.3d at 1030.  That could only have deepened his premature conclusion that Pasha was guilty.  The reason Fox now felt comfortable with his task may well have been, consciously or unconsciously, that he was ready to simply finish the trial and convict Pasha.

The circumstances in which Fox gave his assurances were unreliable, making the district court's evaluation of him unreliable as well. Contrary to the government's invitation, the juror merely having asserted he was now impartial is insufficient for this Court to disregard the bias he so fervently expressed a short time before.

Fox's statements that he was no longer biased are additionally unreliable because they contradicted what he had previously declared. Fox made expressly clear that his mental condition would not let him forget that bias. It was unreasonable to conclude that the passing of a couple of days would eliminate a bias so ardently expressed, which implicated a personal history of deep trauma.

Taken as a whole, Fox's statements about his bias were equivocal, which violates the constitutional right to a jury trial. In fact, as described in the opening brief, even in the midst of his impartiality comments, his statements had the ring of a lingering bias against Pasha's defense: "[T]he entire thing, the entire time you were talking, that was all it was. That's all I was hearing from you was that there was discrimination, that they were

22

against people of the Islamic faith, things like that, and that kind of just got stuck in my head." 2-ER-105. Viewing the record in totality, Fox's equivocation rendered him inappropriate to be a juror. *See United States v. Mitchell,* 568 F.3d 1147, 1151 (9th Cir. 2009) (actual bias is found where prospective juror responds equivocally).

Finally, none of cases on which the government principally relies, where a juror gave adequate subsequent assurances, aid its claim because none included facts like the present case. In none of those cases did a juror make comments so angry toward and dismissive of the defense as Fox did. In *Martinez-Martinez*, 369 F.3d at 1080, the only thing that potentially demonstrated bias was the juror raising his hand when the venire was asked if anyone would be uncomfortable with a defense that the defendant didn't form the intent to commit the crime because he was under the influence of drugs. When the prospective jurors were subsequently asked whether there was anyone who couldn't follow the law as given, or couldn't put aside their daily experiences, the juror didn't indicate he

couldn't. *Id*. This Court was correct in finding no abuse of discretion on such mild facts, which are plainly distinguishable from Fox's ardent bias.

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997) was a civil case in which the concern of bias was likewise far weaker than in Pasha's case. The juror had had a previous negative experience working with the Kodak company, which was one of the parties, with how it had handled his account, and he reported to the judge that he was struggling to remain impartial. *Id*. at 1220. At a subsequent inquiry, however, the juror said he had always prided himself on being a fair and just person and would let the facts speak for themselves. *Id*. This Court upheld the district court's decision to retain the juror. *Id*. at 1221. *Image Tech*. is plainly distinguishable because the juror's displeasure with how a company had handled his account pales in comparison to Fox's trauma from being physically attacked multiple times due to his gender identity. Thus, impartiality could far more easily be assured based on the *Image Tech.* juror's ameliorative comments. Additionally, the case involved none of the pressure that Fox was under.

24

*United States v. Alexander*, 48 F.3d 1477 (9th Cir. 1995) is readily distinguishable from the present case in terms of what the prospective jurors said regarding whether they could be impartial. In *Alexander*, the case charged armed bank robbery, and two jurors expressed some concern because they or their family members had been victims of robbery. *Id*. at 1482. Despite this, they said they "believed" they could be fair. *Id*. at 1482-83. One juror followed it up with a definitive statement of impartiality, but the other never did. *Id*. at 1484. As to the latter, this Court deferred to the district court's interpretation that the juror "believing" she could be impartial was equivalent to saying she that she could be. *Id*. The case is very different from Pasha's because the *Alexander* jurors never said they couldn't be impartial – let alone did they make comments like Fox's statements that he was outraged by the defendant's defense, it would fester in his head, and he couldn't let it go. And once again, they weren't under the pressure that Fox was.

In sum, none of the cases offered by the government involved a juror so plainly expressing bias against, and prejudgment of, the defense, nor a

self-described inability to let it go. While the concern of bias in those

cases may have been adequately dispelled by subsequent statements of

impartiality, Fox's was not. The totality of his comments showed

equivocation and contradiction. And his ostensible assurances were

given under circumstances that rendered them unreliable. At a minimum,

there was plainly a *doubt* about his ability to be unbiased, which mandated

that he be dismissed. *Martinez-Martinez*, 369 F.3d at 1082. The district

court manifestly erred by allowing Fox to participate in convicting Pasha.

## II.  THE CONVICTIONS FOR AGGRAVATED IDENTITY THEFT IN COUNTS 29-33 LACK SUFFICIENT EVIDENCE, IN VIOLATION OF DUE PROCESS, BECAUSE IDENTITY USE WASN'T AT THE CRUX OF THE OFFENSES.

The government's primary response is that Pasha's use of Mansoor's

and Wilson's names on the FIG and OS applications facilitated the loans

because an owner's signature was required, a CEO's criminal history could

disqualify the applicant (however, it didn't disqualify Pasha from getting

the AHOD loan), and the CEO being involved with other entities was a

factor. Yet the government overlooks that "being at the crux of the

criminality requires more than a causal relationship, such as facilitation

of the offense or being a but-for cause of its success." *Dubin v. United States*, 599 U.S. 110, 131 (2023). *Dubin* requires that the use of someone's identity must be at the crux of what made the act fraudulent – a key mover in the criminality. Like the use of the daughter's name to obtain a prescription that wasn't for her in *United States v. Gladden*, 78 F.4th 1232, 1248 (11th Cir. 2023), Pasha's use of the other men's names on the applications may have been a but-for cause, but it wasn't at the crux of the fraud. An owner's signature was required for a loan, but likewise a patient's name was necessary on the prescription, and multiple prescription applications by one patient may not have bee granted. Moreover, here there was no lie as to the "who" – which companies were applying for the loans. Rather, the crux was that these companies didn't have hundreds of thousands of dollars in payroll.

This case is distinguishable from the government's only published Ninth Circuit citation, *United States v. Parviz*, 131 F.4th 966, 970-71 (9th Cir. 2025), where the mother forging a doctor's note, without which her daughter's passport couldn't have been issued in absentia, was a key

27

mover in the passport fraud. Pasha's use of the other men's names as a mere facilitating element in having the paperwork wasn't at the heart of the fraud, as was forging a doctor's note in *Parvis* that was the critical element in getting the passport granted. Pasha's convictions violate *Dubin* and must be reversed.

## III.   COUNTS 47 AND 49 MUST BE REVERSED.

Pasha rests on the arguments he made in the opening brief.

## IV.–V.  COUNTS 47 AND 48 MUST BE REVERSED.

The government's responses to the insufficiency of the evidence and instructional error are based on a fundamental misconception. From start to finish, Count 48 was prosecuted as corrupt persuasion of *Dr. Gohil*, not Mansoor. The indictment charged corrupt persuasion of "another person" to prevent the testimony of "a person, M.B." by having Dr. Gohil provide a letter. 3-ER-357. The reference to Mansoor as the person testifying, and the omission of that reference in "another person," make plain what was obvious from the presentation of the case: Dr. Gohil was the target of the

persuasion for this charge.  The prosecutor solidified this by arguing to the jury, "He's charged in Forty-Eight with tampering *by manipulating* Mansoor Bey's *doctor*."  2-ER-297 (emphasis added); *accord* 2-ER-298 ("trying to prevent Mansoor Bey from testifying by manipulating and deceiving Dr. Gohil").  That is the charge, evidence, and argument on which the erroneous instructions and verdicts were based.

## VI.    COUNT 36 VIOLATED THE SECOND AMENDMENT.

Pasha rests on the arguments in his opening brief.

## VII.    THE GUIDELINES ENHANCEMENT FOR MISREPRESENTATION AS A CHARITABLE ORGANIZATION WAS AN ABUSE OF DISCRETION, REQUIRING REMAND FOR RESENTENCING.

Pasha has explained that the district court miscalculated his Guidelines offense level by applying U.S.S.G. § 2B1.1(b)(9), which provides for an enhancement where the defendant pretended to act on behalf of a charitable organization.  AOB-84-88.  No witness testimony or other evidence demonstrated that Pasha held AHOD out to be a charitable organization.  The district court abused its discretion by relying on an

erroneous legal ruling that all nonprofits are charitable organizations. The incorrect determination of Pasha's Guidelines offense level requires remand for resentencing.

In its brief, the government similarly conflates nonprofits with charitable organizations. It is unable to cite any statute, Guidelines provision, or case law that so states. Proving this enhancement was the government's burden, and it has failed to do so. *United States v. Lucas*, 101 F.4th 1158, 1162 (9th Cir. 2024).

Phrases in the Guidelines are interpreted according to their ordinary meaning. *United States v. Banks*, 55 F.4th 246, 257 (3d Cir. 2022). The plain meaning of a charitable organization is one that provides "charity" – "aid given to those in need," i.e., "the needy or suffering." Merriam-Webster Dictionary (2026), *available at*: https://www.merriam-webster.com/ dictionary/charity; *see also* Dictionary.com ("charity" is "generous actions or donations to aid people who are poor, ill, or needy"). Similarly a "charity," in the sense of an entity that provides charity, is defined as "an institution engaged in relief of the poor." Merriam-Webster Dictionary

(2026). AHOD's purpose was to provide housing and supportive services to people who were released from custody, not to the poor, ill, or needy. For instance, Mansoor lived at AHOD because he was a sex offender who had difficulty finding housing elsewhere, 2-ER-180, 210-12, not because he was poor. Nor was AHOD dispensing goods paid for with charitable donations. It was a government contractor, paid by the government for each person it housed. The plain meaning of "charitable organization," as one that provides goods or services to the poor or suffering, is the one the district court was required to follow. *See Banks*, 55 F.4th at 257.

The government nonetheless asks this Court to interpret the phrase by using a tax law that is nowhere referenced in the Guidelines. The government maintains that, because AHOD was incorporated as a nonprofit that would qualify for a tax exemption under 26 U.S.C. § 501(c)(3), that statute should supplant the plain meaning of the guideline. Section 501(c)(3) gives a tax exemption to nonprofits that are "organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or

31

international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals . . . ." *Id*. The language of the statute itself shows, as does common knowledge, that not every nonprofit is a charity. Yet the government attempts to lump them all together by citing a portion of the IRS website, which states, "Organizations described in section 501(c)(3) are commonly referred to as **charitable organizations**." *Available at*: https://www.irs.gov/charities-nonprofits/charitable-organizations/exemption-requirements-501c3-organizations (bolding in original). This website merely provides general information to the public. Its colloquial reference to 501(c)(3) organizations as "charitable organizations" does nothing to aid respondent's legal claim because it isn't a statute or a regulation, nor does it even purport to be making a legal interpretation.

The government asserts that, "[w]hile not every nonprofit is considered a charity, nonprofits registered under 26 U.S.C. § 501(c)(3) are treated as 'charitable organizations.'" AB-51. Yet that contradicts the text

of the statute, which also includes *inter alia* religious, scientific, public safety testing, literary, and educational organizations.  Noone reading U.S.S.G. § 2B1.1(b)(9) would it interpret it as allowing a criminal defendant's sentence to be increased because he purported to be acting on behalf of a literary organization.  Merely being registered under § 501(c)(3) doesn't make an organization a charity.

Furthermore, the government says that Pasha's claim fails because "[h]e offers no reason why a nonprofit should not qualify as a charitable organization . . . ."  AB-50.  This argument patently mistakes which party has the burden of proof.  It was the government's burden to prove that AHOD was a charity, not Pasha's burden to disprove it.  *Lucas*, 101 F.4th at 1162.  The government didn't submit any proof that AHOD met the definition of a charitable organization, and its citation to an IRS webpage on appeal similarly fails to do so.

Indeed, the government also didn't introduce AHOD's 501(c)(3) incorporation documents, nor any other evidence of the nature of its 501(c)(3) status.  It was up to the government to prove that AHOD was

registered as a charitable organization rather than, for instance, an educational organization. Notably, AHOD employee Vandrick Towns testified that the group counseling he provided consisted of "*curriculums*, such as anger management, criminal addictive thinking, drug and alcohol *education*, and socialization . . . ." 5-PER-655 (emphasis added).

Finally, the government cites two out-of-circuit cases and an unpublished district court opinion, none of which aids its claim. None of these cases held that all 501(c)(3) organizations are charities under the guideline, and in fact some support Pasha's plain-meaning reading. In *Mollica v. United States*, No. 2:14-CR-329-KOB, 2019 WL 1296255, at *34 (N.D. Ala. Mar. 21, 2019) (unpublished), the organization provided healthcare to the *poor*. In *United States v. Aderinoye*, 33 F.4th 751, 758 (5th Cir. 2022), the classic example the court cited was the *Salvation Army*.

Moreover, opinions aren't authority for propositions they didn't consider. *United States v. Kirilyuk*, 29 F.4th 1128, 1134 (9th Cir. 2022). In *Aderinoye*, the organization at issue provided assistance to terminally ill individuals and their families. *Aderinoye*, 33 F.4th at 758. It isn't stated

what kind of assistance it was, nor whether the people were poor.  In *United States v. Fumo*, 655 F.3d 288, 295 (3d Cir. 2011), the defendant didn't challenge whether the organization there was a charity; the claim was that he didn't intend to divert the funds from the organization for his personal use.  Accordingly, none of the government's cases supports that a 501(c)(3) organization must be a charitable organization.

In short, when Pasha objected that AHOD wasn't a charity, it was up to the government to demonstrate that the enhancement applied, which it failed to do.  Pasha is entitled to a new sentencing hearing.  AOB-88.

## VIII.  THE LOSS AMOUNT CANNOT INCLUDE INTENDED LOSS.

The district court erred by resorting to Guidelines commentary regarding intended loss, when the plain meaning of "loss" in U.S.S.G. § 2B1.1 unambiguously, and pursuant to common sense, doesn't include loss that never occurred.  AOB-88-96.  The government observes there was a longstanding practice of courts "us[ing] intended loss since the earliest Guidelines."  AB-57.  However, this ignores that *Kisor v. Wilkie*, 588 U.S. 558, 573 (2019) overturned the longstanding practice of courts deferring to

Guidelines commentary where there is nothing "genuinely ambiguous" about the meaning of the guideline text in its context. Similarly, the government misapplies *Kisor* when it insists that intended loss is a "reasonable reading" of "loss." AB-57. The reasonableness of the commentary's interpretation is not the standard. *Kisor* requires that the guideline language itself be genuinely ambiguous before a court can defer to the commentary.

This Court hasn't yet published a decision regarding whether, for the pre-2024 Guidelines, "loss" unambiguously doesn't include loss that was only intended and never occurred. The government's cited case of *United States v. Diop*, No. 24-3774, 2025 WL 2602277 (Sep. 9, 2025) is unpublished, and this Court is at liberty to reach a contrary conclusion. Similarly, *United States v. Hackett*, 123 F.4th 1005, 1013 (9th Cir. 2024) doesn't control because that case only found no *plain error* in using intended loss, whereas Pasha preserved his claim for this Court's *de novo* review.

In addition, the government is incorrect that *United States v. Yafa*, 136 F.4th 1194 (9th Cir. 2025) has "foreclose[d] any challenge to *Kisor*'s first

36

prong," which requires that a guideline's language must be genuinely ambiguous before a court can resort to the commentary. AB-57. *Yafa* addressed a different commentary provision, Application Note 3(B), which allowed a court to use gain as an alternative measure of loss where there was an actual loss but the amount couldn't reasonably be determined. § 2B1.1, cmt. n. 3(B). The Court held that "loss" was sufficiently ambiguous *for that purpose*. *Yafa*, 136 F.4th at 1198. But *Yafa* specifically noted its "conclusion [wa]s limited to Application Note 3(B) and says nothing about the reasonableness of Application Note 3(A)'s instruction defining loss as the 'greater of actual loss or intended loss.'" *Id*. at 1199 n.5.

In fact, *Yafa*'s discussion of the potential meanings of "loss" supports *Pasha's* position because its explanation was that, "[i]n the economic context," loss could reasonably defined as either the amount lost, or "more broadly the entire 'detriment or disadvantage involved in being deprived of something.' [Citation.]" *Id*. Both of those definitions involve an *actual* deprivation. *Yafa*, 136 F.4th at 1198. Accordingly, the zone of ambiguity doesn't extended to intended loss that never occurred. *Yafa* doesn't

foreclose Pasha's claim in this circuit, and this Court is free to reach its own decision.

With respect to other circuits, the government cites the circuit split and maintains that this Court should follow the "clear weight of authority" that allows intended loss. AB-56. On the contrary, it isn't the number of circuits but the persuasiveness of their view that must carry the day. *See, e.g.*, *Rehaif v. United States*, 588 U.S. 225, 238 (2019) (Alito, J., dissenting) (Supreme Court majority overturned "long-established interpretation of an important criminal statute," which "ha[d] been adopted by every single Court of Appeals"). This Court should join the Third Circuit in *Banks* because it is the most compelling. All of the plain-meaning, dictionary definitions of loss speak of an actual loss, deprivation, or decrease. *Id*. at 257-58. It is only the commentary that injects any ambiguity into "loss" by raising the concept of intended loss. *Id*. at 258 n. 56.

Indeed, while *Yafa* held that the meaning of "loss" wasn't so rigid as to prohibit loss from being measured by the defendant's gain, there is no

38

rational argument that "loss" can mean loss that never occurred. Non-existent loss, by definition, is not loss.

The government's primary objection is that, if intended loss isn't included, the guideline won't properly account for a defendant's relative culpability. But the Guidelines' "purpose . . . is to impose higher sentences for offenses that involve greater amounts of harm," not "potential harm that has not occurred." *United States v. McKinney*, 645 F. Supp. 3d 709, 720 (E.D. Mich. 2022) (footnote omitted). The Guidelines already account for such differences in culpability by specifically affording courts the authority to vary upward from the advisory Guidelines range in cases where that range doesn't adequately take into account a defendant's culpability, which courts regularly employ. And in appropriate cases, defendants who intended additional loss will be guilty of the additional crime of conspiracy or attempt, and receive additional punishment. The answer to the question of relative culpability isn't to torture the plain meaning of the word "loss."

Even if the government were correct that interpreting "loss" to include only actual loss won't fully account for relative culpability, that

fails to explain how the word "loss" in a financial fraud statute is genuinely ambiguous. *McKinney*, 645 F. Supp. 3d at 720 n.5. Nor does this one particular guideline need to take on the responsibility of accounting for the entirety of a defendant's culpability.

Moreover, it actually *threatens* the interests of consistency in sentencing for relative culpability to inject the nebulous concept of intent. Intent is easy to allege. Did a defendant who possessed a list of credit card numbers on his computer intend to use them all for additional fraud? The government would likely prevail on such claims, inconsistently, when all that is required is a preponderance of the evidence. *Lucas*, 101 F.4th at 1162.

Furthermore, the government's attempt to bootstrap in the relevant conduct rule of § 1B1.3 is unavailing. Section 1B1.3(a)(3) states that for the calculation of specific offense characteristics, the relevant conduct includes all harm that resulted from the acts and all harm that was the object of the acts. But "[s]ection 1B1.3 does not create a scope of relevant conduct that has independent significance" – it simply sets forth the outer limits of

conduct and harm that can potentially be taken into account to the extent permitted under the applicable, more-specific, offense conduct Guideline in Chapter 2. *United States v. Cruz-Gramajo*, 570 F.3d 1162, 1172 (9th Cir. 2009). This is clear from § 1B1.3's introductory clause, which instructs that the conduct and harm it defines must be considered "*[u]nless otherwise specified*" by the relevant offense level guideline in Chapter 2. § 1B1.3(a) (emphasis added).

Additionally, Application Note 6(B) to § 1B1.3 specifically provides: "Unless clearly indicated by the guidelines, harm that is merely risked is not to be treated as the equivalent of harm that occurred. In a case in which creation of risk is not adequately taken into account by the applicable offense guideline, an upward departure may be warranted." This supports Pasha's point that intended loss (a mere risk of harm) isn't to be included in "loss." Rather, it should only be taken into account for a departure from the Guidelines, if they don't adequately reflect the defendant's culpability.

Indeed, the general approach of § 1B1.3 can't supplant a specific, unambiguous guideline. The examples abound. Section 2K2.1(a)(1)(A)(i)

sets a base offense level of 26 if the offense involved a "semiautomatic firearm that is capable of accepting a large capacity magazine." It is beyond dispute that this guideline wouldn't apply to a defendant who merely decided to purchase a large-capacity magazine but never did. Likewise, § 2B1.1(b)(2)(A)(i) imposes an enhancement of two levels if the offense "involved 10 or more victims." If the defendant harmed only eight victims, and intended to harm two more victims in the future but never acted on it, § 1B1.3 couldn't transform it into a 10-victim crime. There either was or wasn't a semiautomatic firearm with a large-capacity magazine; there either were or weren't 10 victims; there either was or wasn't loss.

In sum, *Kisor* doesn't permit deference to commentary unless the plain text is genuinely ambiguous, and the Guidelines already provide a solution for cases where actual loss doesn't adequately penalize a more culpable defendant. The district court legally erred and abused its discretion by including intended loss in Pasha's Guidelines calculation. He is entitled to a new sentencing hearing.

## IX.    RESTITUTION

Pasha rests on the arguments in his opening brief.

Dated: February 11, 2026          Respectfully submitted,

                                  s/  *David L. Annicchiarico*

                                  _____

                                  DAVID L. ANNICCHIARICO
                                  Counsel for Appellant

## CERTIFICATE REGARDING CIRCUIT RULE 32-1

Under Rule 32 of the Federal Rules of Appellate Procedure and

Circuit Rule 32-1, I hereby certify that the above brief uses a 14-point,

proportionately spaced type, that the text is double-spaced, and that the

footnotes are single-spaced.  I further certify that, according to the word

count feature of Microsoft Word for Mac, the total word count is 6,892

words, excluding the parts of the brief exempted by Rule 32(f), and as

permitted by this Court's May 27, 2025 order.

Dated: February 11, 2026          s/  *David L. Annicchiarico*

                                  _____

                                  DAVID L. ANNICCHIARICO
                                  Counsel for Appellant